UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRY BAILEY, 156122,

      Petitioner,                                    Civil Action No. 15-CV-12727

vs.                                            HON. BERNARD A. FRIEDMAN

RANDALL HAAS,

      Respondent.
_____/

## OPINION AND ORDER DENYING PETITIONER'S APPLICATION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

This is a habeas case brought pursuant to 28 U.S.C. § 2254. Petitioner was convicted of first-degree murder following a bench trial in Wayne County Circuit Court and was sentenced to life imprisonment without the possibility of parole in 2010. He raises claims concerning the sufficiency of the evidence, the admission of his confession to the police, the legality of his arrest and a search warrant, the DNA evidence and chain of custody, the adequacy of the trial court's factual findings, his non-prosecution on outstanding warrants, alleged newly-discovered/non-disclosed evidence, and the effectiveness of trial and appellate counsel. Respondent has filed an answer arguing that the petition should be denied. For the reasons set forth below, the Court denies the petition for a writ of habeas corpus.

## I. Background

Petitioner's conviction arises from the death of Gloria Paramore at her home in Detroit, Michigan on June 13, 2009. The Michigan Court of Appeals described the relevant facts as follows:

On June 13, 2009, Paramore was found in her kitchen laying on her back

bleeding heavily from the head. There were no signs of forced entry. An autopsy revealed at least 19 blunt force impacts to her head, which were consistent with being struck with both the head and claw of a hammer. Paramore had also suffered defensive wounds, including underlying palpable fractures of the hand bones.

During their investigation, police learned that Paramore hired defendant to do concrete work at her home. A search warrant was executed on defendant's home, where officers discovered a pair of blood-stained work boots matching deoxyribonucleic acid (DNA) from the victim. Officers also found papers inside defendant's house and van bearing the Paramore's address, and discovered inside the victim's house a paper on which someone had written defendant's name and phone number.

In a statement to police, defendant admitted that he killed Paramore. The questions and answers were memorialized in writing:

> *Question*, "Mr. Bailey, do you know a woman by the name of Gloria Paramore?" Answer, "Yes."

> *Question*, "How long have you known her?" Answer, "Since Wednesday, June 10th."

> *Question*, "[H]ow is it that you came to know her?" Answer, "Through a lodge brother."

> * * *

> . . . "He called me on the phone and referred me for a concrete job for Ms. Paramore."

> * * *

> *Question*, "Did you speak with Ms. Paramore on Friday, June 12th?" Answer, "Yes, I called her."

> *Question*, "What was the discussion about?" Answer, "When I was going to pour it. . . . She wasn't happy."

> *Question*, "How so?" Answer, "She wanted to pour it right away but I told her it rained Thursday, so then I went over there [alone]. . . . [I]t had to be earlier than [4:30 p.m.]."

> * * *

*Question*, "Did Ms. Paramore invite you in?"  Answer, "Yes, in the back she unlocked the door."

* * *

*Question*, "Did you have a discussion with her?"  Answer, "Yes, it was about when I could pour the cement because I had to pay my crew and my rent."

*Question*, "What did she say?"  Answer, "She said she wouldn't have the money till [sic] the 16th and wasn't going to give me no more money until then. . . . I told her that wasn't in the contract."

*Question*, "Was she supposed to pay you on Friday?"  Answer, "Yes."

*Question*, "Did you become angry?"  Answer, "Yes, I had been drinking, and she said if I didn't like it, she would get someone else to do it and she wasn't satisfied with what I had done already. . . . [I][g]ot angry.  It wasn't fair or right.  My mind just snapped and I hit her."

*Question*, "What did you hit her with?"  Answer, "It was marble-like. . . . It was grayish like with flowers on it.  There was felt on the bottom of it."

*Question*, "Where did you get it from?"  Answer, "Off the kitchen counter. . . . She was by the sink, the water was on and she was talking sharp towards me.  I see the solid marble ball on the counter to her right.  I was standing by the door entrance back.  I grabbed the ball and swung at her.  She looked right at me and I hit her on the side of the head with the ball."

* * *

*Question*, "Did you hit her again?"  Answer, "Yes, but then I dropped the ball [and left]."

* * *

*Question*, "Is there anything you would like to add to the statement?"  Answer, "Yes, I just went to get my money so I

> could finish the job and pay my bills. There was no intent to kill
> her and I'm sorry to the family."
>
> Defendant's motion to suppress the statement had been previously denied.
> The trial court, as finder of fact, rejected defendant's claim that there
> insufficient evidence of premeditation or deliberation and convicted
> defendant of first-degree murder.

*People v. Bailey*, No. 298357, 2011 WL 5374959, at *1-2 (Mich. Ct. App. Nov. 8, 2011)

(unpublished) (emphasis in original) (alterations in original).

Following his conviction and sentencing, petitioner filed an appeal of right with

the Michigan Court of Appeals raising claims concerning the sufficiency of the evidence and the

admissibility of his confession. The Michigan Court of Appeals denied relief on those claims

and affirmed his conviction. *Id*. at *2-8. Petitioner filed an application for leave to appeal with

the Michigan Supreme Court, which was denied. *People v. Bailey*, 491 Mich. 911; 810 N.W.2d

573 (2012).

Petitioner filed an initial habeas petition with this Court in 2012, but it was

dismissed without prejudice in 2013 to allow him to return to the state courts and exhaust

additional claims before proceeding on federal habeas review.

Petitioner then filed a motion for relief from judgment with the state trial court

raising claims concerning the legality of his arrest and the search warrant, the DNA evidence and

chain of custody, the trial court's factual findings, the effectiveness of trial and appellate

counsel, his non-prosecution on outstanding warrants, and newly-discovered/non-disclosure of

evidence. The trial court denied relief on those claims pursuant to Michigan Court Rule

("MCR") 6.508(D)(3), finding that petitioner failed to establish good cause for not previously

raising the issues and/or actual prejudice. *People v. Bailey*, No. 09-031241-FC (Wayne Cty.

Cir. Ct. Jan. 7, 2014). Petitioner filed an application for leave to appeal with the Michigan Court of Appeals, which was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Bailey*, No. 320064 (Mich. Ct. App. June 27, 2014). Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied. *People v. Bailey*, 497 Mich. 981; 861 N.W.2d 23 (2015).

Petitioner thereafter filed this instant federal habeas petition raising the same claims presented to the state courts on direct appeal and collateral review of his conviction. Respondent has filed an answer to the petition arguing that it should be denied because certain claims are barred by procedural default, certain claims are not cognizable on habeas review, and all of the claims lack merit. Petitioner has replied.

## II. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners challenging their state-court convictions. The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)) (alterations added).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413) (alterations added). However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted) (alteration added). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

The Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary

conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). A habeas court "must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain federal habeas relief, a state prisoner must show that the state court's rejection of a claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016).

Section 2254(d)(1) limits a federal court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court" (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam))). The requirements of "clearly established law" are to be determined solely by Supreme Court precedent. Thus, federal circuit or district court cases do not constitute clearly

established law and cannot provide the basis for federal habeas relief. *See Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam). The decisions of lower federal courts, however, may be useful in assessing the reasonableness of a state court's decision. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (internal citation omitted).

Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (emphasis in original) (alterations added).

Habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). A state court's factual determinations are presumed correct on federal habeas review. 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## III. Discussion

### A. Claims Barred by Procedural Default

Respondent first argues that petitioner's habeas claims concerning the legality of his arrest and the search warrant, the DNA evidence and chain of custody, the adequacy of the trial court's factual findings, his non-prosecution on outstanding warrants, alleged newly-discovered/non-disclosed evidence, and the effectiveness of trial counsel are barred by

procedural default. Petitioner first raised these issues in the state courts on post-conviction collateral review, and the state courts denied relief pursuant to MCR 6.508(D).

Federal habeas relief may be precluded on a claim that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991). The doctrine of procedural default applies when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001). "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last explained state court ruling is used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).

Petitioner first presented these claims to the state courts in his motion for relief from judgment. Both the Michigan Supreme Court and the Michigan Court of Appeals denied relief pursuant to MCR 6.508(D), which provides, in part, that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom. *See* MCR 6.508(D)(3). The Sixth Circuit has held that the form orders that were used by the Michigan appellate courts citing MCR 6.508(D) to deny petitioner leave to appeal are ambiguous as to whether they refer to a procedural default or a denial of relief on the merits and are therefore "unexplained"

(meaning "the text of the order fails to disclose the reason for the judgment"). *Guilmette v. Howes*, 624 F.3d 286, 288, 291-92 (6th Cir. 2010) (en banc). Consequently, under *Guilmette*, the Court must "look through" the unexplained orders of the Michigan appellate courts to the state trial court's decision to determine the basis for the denial of state post-conviction relief. *Id.* at 291-92, 302.

In this case, the state trial court denied relief on procedural grounds by ruling that petitioner had not shown cause and actual prejudice under MCR 6.508(D)(3) for his failure to raise the claims on direct appeal of his conviction. The state courts thus relied upon a procedural default to deny petitioner relief on these claims. Accordingly, petitioner's claims as to the legality of his arrest and search warrant, the DNA evidence and chain of custody, the adequacy of the trial court's factual findings, his non-prosecution on outstanding warrants, alleged newly-discovered/non-disclosed evidence, and the effectiveness of trial counsel are procedurally defaulted.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). To establish cause, a petitioner must establish that some external impediment frustrated his ability to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner must present a substantial reason to excuse the default. *Amadeo v. Zant*, 486 U.S. 214, 223 (1988). Such reasons include interference by officials, attorney error rising to the level of ineffective

assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available.  *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).

In the present case, petitioner asserts ineffective assistance of appellate counsel as cause to excuse his default.   To establish ineffective assistance of counsel, the petitioner must show "that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   In assessing whether counsel's performance was deficient

> [t]he court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance . . . . At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690.   Judicial scrutiny of counsel's performance is thus "highly deferential."  *Id*. at 689.  The defense is prejudiced only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.

A criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).   The Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy . . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id*. at 754.   Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel."  *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).   In fact, "the hallmark of effective appellate advocacy" is the "process

of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," defined as an issue which was obvious from the trial record and would have resulted in reversal on appeal. *Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Petitioner fails to show that by omitting the claims presented in his motion for relief from judgment, appellate counsel's performance fell outside the wide range of professionally competent assistance. Appellate counsel raised substantial claims on direct appeal, including claims challenging the sufficiency of the evidence and the admission of petitioner's confession to the police. None of the defaulted claims are "dead-bang winners" given that the state trial court ruled that they lack merit and in light of the significant evidence of guilt presented at trial. Moreover, even if appellate counsel erred, petitioner cannot show that he was prejudiced by appellate counsel's conduct (or demonstrate prejudice to excuse the procedural default) because the defaulted claims lack merit for the reasons stated by the trial court in denying relief from judgment, *see Bailey*, No. 09-031241-FC, at *2-8, and as further discussed by respondent. *See* Resp't's Answer, pp. 27-29, 31-41, 44, 46-52. Petitioner fails to establish that counsel erred or that he was prejudiced by counsel's conduct as required by *Strickland*. Petitioner thus fails to establish cause and prejudice to excuse his procedural default.

Petitioner also fails to demonstrate that a fundamental miscarriage of justice occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). To be credible, such a claim requires a petitioner to provide new, reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Moreover, actual innocence means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). Petitioner makes no such showing. His habeas claims concerning the legality of his arrest and search warrant, the DNA evidence and chain of custody, the adequacy of the trial court's factual findings, his non-prosecution on outstanding warrants, alleged newly-discovered/non-disclosed evidence, and the effectiveness of trial counsel are thus barred by procedural default, lack merit, and do not warrant habeas relief.

### B. Ineffective Assistance of Appellate Counsel Claim

Petitioner also raises an independent claim that appellate counsel was ineffective by failing to raise the foregoing habeas claims on direct appeal. Respondent argues that this independent claim lacks merit. The state trial court denied relief on this claim on collateral review on the grounds that petitioner could not establish that appellate counsel was ineffective because the underlying claims lacked merit. *See Bailey*, No. 09-031241-FC, at *5-6. The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. The ineffective assistance of appellate counsel claim, while not itself procedurally defaulted, nonetheless lacks merit. As discussed above, petitioner fails to establish that appellate counsel was ineffective under the *Strickland* standard and the defaulted

claims lack merit. Appellate counsel cannot be deemed ineffective for failing to raise issues that lack merit. *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010). Habeas relief is not warranted on petitioner's ineffective assistance of appellate counsel claim.

### C. Insufficient Evidence Claim

Petitioner asserts that he is entitled to habeas relief because the prosecution failed to present sufficient evidence to support his first-degree premeditated murder conviction. Respondent contends that this claim lacks merit.

The federal due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The question on a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16).

A federal habeas court views this standard through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Thus, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review: the factfinder at trial and the state court on appellate review, as long as those determinations are reasonable. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). "[I]t is the responsibility of the jury – not the court – to

decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). The "mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Id.* at 788-89.

Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. *People v. Kelly*, 231 Mich. App. 627, 642; 588 N.W.2d 480 (1998); Mich. Comp. Laws § 750.316. Premeditation and deliberation may be established by evidence showing "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich. App. 158, 170; 486 N.W.2d 312 (1992); *see also People v. Abraham*, 234 Mich. App. 640, 656; 599 N.W.2d 736 (1999). While there is no minimum time required to show premeditation under Michigan law, the time between initial thought and ultimate action should be long enough for a reasonable person to take a "second look" at the situation. *Abraham*, 234 Mich. App. at 656. "A few seconds between the antagonistic action between the defendant and the victim and the defendant's decision to murder the victim may be sufficient to create a jury question on the issue of premeditation." *Alder v. Burt*, 240 F. Supp. 2d 651, 663 (E.D. Mich. 2003).

As with any crime, the prosecution must prove beyond a reasonable doubt that the defendant committed the charged offense. *People v. Kern*, 6 Mich. App. 406, 409; 149 N.W.2d

216 (1967). Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, *People v. Jolly*, 442 Mich. 458, 466; 502 N.W.2d 177 (1993), including the identity of the perpetrator, *Kern*, 6 Mich. App. at 409, and the defendant's intent or state of mind. *People v. Dumas*, 454 Mich. 390, 398; 563 N.W.2d 31 (1997). The use of a lethal weapon supports an inference of an intent to kill. *People v. Turner*, 62 Mich. App. 467, 470; 233 N.W.2d 617 (1975).

Applying the *Jackson* standard and the state standards laid out above, the Michigan Court of Appeals denied relief on petitioner's insufficient evidence claim for the following reasons:

> There is sufficient evidence in the record to support the trial court's verdict. Defendant admitted assaulting the victim. The forensic examiner's testimony and report detailed that the victim was struck at least 19 times in different areas of her head and face, which broke open the victim's skull in multiple locations. The victim also had defensive wounds to her right hand in the form of bruises and fractures of the hand. According to the examiner, the victim's wounds were consistent with having been struck with different ends of a hammer. Police photographs supported an inference that the attack of the victim began in one room of the victim's house and progressed into another area of the house. The photographs illustrated the presence of blood and brain matter in the kitchen and the dining or living room.
>
> The evidence supports the trial court's finding beyond a reasonable doubt that defendant premeditated and deliberated his killing of the victim. The testimony, photographs, and other evidence allowed the court to find that defendant struck the victim at least 19 times with opposite ends of a hammer, to different areas of the victim's head and face, all of which occurred in different areas of the victim's house. The circumstances concerning the nature of the killing suffice to establish that defendant had an opportunity to reconsider his actions in the course of his assault of the victim, and thus that he premeditated and deliberated the killing. *People v. Coy*, 243 Mich App 283, 315–316; 620 NW2d 888 (2000) (finding premeditation and deliberation, in part, because the victim suffered 25 to 30 stab wounds, including several defensive wounds); *People v. Kelly*, 231 Mich App 627, 642; 588 NW2d 480 (1998) (explaining that between

16

different methods of assaulting the victim, "the killer had the opportunity to reflect upon his actions"); *People v. Haywood*, 209 Mich App 217, 230; 530 NW2d 497 (1995) (observing that the defendant's infliction of a beating with two different items gave the "defendant the time to take a second look and reconsider his decision").

In summary, the trial court accurately recited the evidence presented at trial, and the evidence supports the court's finding that defendant killed the victim in a premeditated and deliberated fashion.

*Bailey*, 2011 WL 5374959, at *3-4.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The evidence presented at trial, viewed in the light most favorable to the prosecution, established that petitioner committed the crime and that he acted with the requisite intent. First, the evidence indicated that petitioner had a dispute with the victim over a cement job, entered the victim's home, grabbed a hammer from the kitchen counter, and struck her in the head repeatedly. Second, the medical examiner testified that the victim suffered nineteen blunt force impacts to her head and face caused by both ends of a hammer and that the victim also had defensive wounds. Third, the police testimony and photographs showed blood and brain matter in two areas of the victim's home, which suggested that the attack began in one area and progressed into another. Such evidence was sufficient to show that petitioner had time to take a "second look" and to consider his actions during the attack and that he acted with premeditation and deliberation so as to support his first-degree murder conviction.

Petitioner also challenges the trial court's evaluation of the evidence presented at his bench trial. However, it is for the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts. *Jackson*, 443 U.S. at 326. "A federal habeas corpus court faced with a

record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983). The trial court's verdict, and the Michigan Court of Appeals' decision affirming that verdict, were reasonable. Habeas relief is not warranted on this claim of insufficient evidence.

### D. Improper Admission of Confession Claims

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in denying his motion to suppress his confession to the police and in admitting the confession into evidence at trial. He asserts that (1) the police disregarded three requests for counsel, (2) one officer ignored his request to cease his second interview, and (3) his confession was involuntary. Respondent contends that these claims lack merit.

#### 1. Requests for Counsel

Petitioner first argues that his confession should have been suppressed because the police disregarded three requests for counsel: one at the time of booking, one during an interview with Secret Service Special Agent Matthew Gunnerson, and one at the beginning of his second interview with Detroit Police Sergeant Gary Diaz.

The Fifth Amendment protects an accused from compulsory self-incrimination. The prohibition against compelled self-incrimination requires that a custodial interrogation be preceded by advice that the suspect has the right to an attorney and the right to remain silent. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 432 (2000) ("*Miranda* and its progeny . . . govern the admissibility of statements

made during custodial interrogation in both state and federal courts."). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

When a suspect has invoked the right to counsel during a custodial interrogation, the suspect may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The request for counsel must be express and unambiguous. *Davis v. United States*, 512 U.S. 452, 459 (1994). If a suspect's reference to counsel is ambiguous or equivocal, the police have no obligation to stop questioning the suspect. *Id.* A suspect must sufficiently articulate his or her desire for counsel so that a reasonable police officer under the circumstances would understand the statement to be a request for an attorney. *Id.*

The Michigan Court of Appeals denied relief on petitioner's request for counsel claim, explaining in relevant part:

> Defendant testified that he asked for an attorney when the police booked him on June 14, 2009. Both defendant and Agent Gunnarson testified that on the evening of June 15, 2009, defendant agreed to speak with Gunnarson and submit to a polygraph test after Gunnarson advised defendant of his right to counsel. *See People v. Slocum* (On Remand), 219 Mich App 695, 704–705; 558 NW2d 4 (1996) (finding that officers scrupulously honored the defendant's constitutional rights, after her invocation of the right against self-incrimination during their first attempted interview, when the officers ceased questioning, waited about 22 hours to reinitiate questioning, and advised the defendant of her constitutional rights at the outset of the second interview). Gunnarson and defendant also consistently recounted at the suppression hearing that

after Gunnarson administered a polygraph examination, defendant invoked his right to counsel and Gunnarson immediately halted the interview and had defendant returned to his jail cell.

After returning defendant to his jail cell, Detroit Police Officer Moises Jimenez left defendant, who was crying, alone for approximately half an hour, and when Jimenez came back to check on defendant, defendant declared, "I'm ready to talk now." While Jimenez attended to other matters, he placed defendant with Sergeant Diaz, who conducted a second interview with defendant. Defendant avers that he invoked his right to counsel at the outset of this second interview, as reflected by the following inquiry by Sergeant Diaz:

> Well, do I want an attorney here? It doesn't matter what I want. What matters is what you want. If you want an attorney here, . . . I'm done talking to you.

Defendant responded, "That's what I'm saying."

With regard to the clarity necessary to invoke a defendant's constitutional right to counsel during a custodial interview, this Court has explained:

> [C]ourts must determine whether the accused actually invoked the right to counsel and . . . this constitutes an objective inquiry. Thus, invocation of the *Miranda* right to counsel requires a statement that can reasonably be construed to be an expression of a desire for the assistance of counsel. *If the accused makes a reference to an attorney and the reference is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the accused might be invoking the right to counsel, the cessation of questioning is not required.* . . .
>
> The question here is whether defendant's statement, "Can I talk to him [a lawyer] right now?" constitutes a clear request for an attorney. We hold that this utterance was not sufficient to invoke the right to counsel and cut off all further questioning under the specific circumstances of this case. . . .
>
> > This colloquy makes clear that *defendant knew of his right to counsel and knew that requesting an attorney would stop the*

> *interview. Nevertheless, defendant chose to*
> *continue the interview.* In this context, we
> think it plain that the words defendant now
> cites in isolation do not constitute an
> unambiguous invocation of the right to
> counsel. [*People v. Adams*, 245 Mich App
> 226, 237–239; 627 NW2d 623 (2001)
> (Emphasis added).]
>
> A reasonable interpretation of defendant's remark, "That's
> what I'm saying," is that the comment amounts to a
> confirmation of defendant's understanding of Sergeant
> Diaz's preceding explanation. Because (1) the remark at
> best only equivocally invoked the right to counsel, (2) the
> transcription of the interview with Diaz revealed that he
> repeatedly advised defendant of his right to counsel, and
> (3) defendant nonetheless "chose to continue the interview"
> without further reference to a desire to have an attorney,
> *Adams*, 245 Mich App 239, we conclude that defendant did
> not actually invoke his right to counsel in the course of his
> interview with Diaz.

*Bailey*, 2011 WL 5374959, at *4-5 (emphasis in original) (alterations in original) (footnote
omitted).

The state court's decision is neither contrary to Supreme Court precedent nor an
unreasonable application of federal law or the facts. With respect to the first request at the time
of booking, the record indicates that the police did not question the petitioner that day, other
than to elicit routine information to facilitate the booking process. There is no right to counsel
during booking. *Sims v. United States*, 343 F. Supp. 2d 621, 624-25 (E.D. Mich. 2004).
Furthermore, such routine, administrative questions during the booking process are not
considered interrogation for *Miranda* purposes. *See Pennsylvania v. Muniz*, 496 U.S. 582,
601-02 (1990). In fact, the Supreme Court has "never held that a suspect can invoke his
*Miranda* rights anticipatorily in a context other than 'custodial interrogation.'" *McNeil v.*

*Wisconsin*, 501 U.S. 171, 182 n.3 (1991) (explaining that "[m]ost rights must be asserted when the government seeks to take the action they protect against. The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect."). Petitioner's request for counsel at the time of booking thus cannot be said to constitute an invocation of his right to counsel during custodial interrogation because no interrogation had yet been undertaken. *United States v. Little*, 9 F.3d 110 (table), 1993 WL 453396, at *5-6 (6th Cir. 1993) (citing *McNeil* and declining to extend request for counsel at time of search to invalidate subsequent waiver at FBI interrogation); *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) ("[B]efore the *Miranda* rights attach, there must be custodial interrogation."). Moreover, petitioner did not make any incriminating statements at booking that were used against him at trial. Petitioner fails to establish that his Fifth Amendment rights or his *Miranda* rights were violated at the time of booking.[1]

As to the second request for counsel, the record shows that Gunnerson met with petitioner the day after he was arrested, advised him of his *Miranda* rights, and only questioned him after he signed a written waiver form and agreed to take a polygraph examination. When petitioner requested counsel after the polygraph examination, Gunnerson honored that request, stopped the interview, and had petitioner taken back to his jail cell. The record thus belies petitioner's claim that his second request for counsel was ignored.

---

[1] Petitioner also references the Sixth Amendment in his pleadings. The Sixth Amendment right to counsel does not attach until the initiation of adversarial judicial criminal proceedings. *Moran v. Burbine*, 475 U.S. 412, 428 (1986); *United States v. Gouveia*, 467 U.S.

Additionally, the interview only resumed after petitioner told Jimenez that he was ready to talk. The police may resume a custodial interrogation, even after a suspect invokes the right to counsel, if the suspect re-initiates the discussion. *See Edwards*, 451 U.S. at 484-85; *Perreault v. Smith*, 874 F.3d 516, 519 (6th Cir. 2017). Such is the case here. Petitioner challenges the state court's finding that he told Jimenez that he was "ready to talk now." The state courts, however, clearly credited Jimenez's testimony on this issue. A state court's credibility determination is entitled to deference on habeas review. *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Such factual findings are presumed correct on habeas review, and a petitioner has the burden of rebutting the presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015). Petitioner makes no such showing. He thus fails to establish a violation of his Fifth Amendment rights or his *Miranda* rights.

As to the third request for counsel, the record indicates that petitioner did not sufficiently invoke his right to counsel during the second interview, which was conducted by Diaz. As noted above, a request for counsel must be express and unambiguous. Petitioner did not make an express and unambiguous request for counsel when he said, "[t]hat's what I'm saying" in response to Diaz's statements. Rather, petitioner's comment could reasonably be construed as an expression of his understanding of his rights and that he, not the police, controlled whether he wanted counsel present. This interpretation is consistent with the fact that petitioner was clearly advised of his right to counsel on multiple occasions and had previously invoked that right with Gunnerson, yet he did not use words to clearly express a

180, 188 (1984). Petitioner's confession was given before the filing of such formal charges.

desire to have counsel present while speaking with the police. Although a contrary interpretation of petitioner's response might also be reasonable, that is not the standard on habeas review. *Williams*, 529 U.S. at 411 (stating that a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"); *Hill v. Anderson*, 881 F.3d 483, 507-08 (6th Cir. 2018) (affirming district court's ruling that petitioner voluntarily waived his *Miranda* rights due to the deference accorded state courts on habeas review while expressing "consternation" with the result). The state court's conclusion is reasonable. Petitioner fails to establish that he made an unambiguous request for counsel after he re-initiated contact with the police and confessed to the crime. He thus fails to establish a violation of his Fifth Amendment rights or his *Miranda* rights. Habeas relief is not warranted on this claim regarding petitioner's three requests for counsel.

### 2. Request to Stop the Second Interview

Petitioner next asserts that the trial court erred in admitting his confession because Diaz failed to honor his request to cease the second interview. When a suspect has validly waived his right to remain silent and agrees to speak with the police, he retains the right to stop the interrogation at any point. Once a suspect makes such a request, the interrogation must cease. *Miranda*, 384 U.S. at 444-45. The fact that the suspect may have answered some questions or volunteered certain information does not deprive him of the right to refuse to continue to speak with the police. *Id*. at 445. "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104

(1975) (quoting *Miranda*, 384 U.S. at 474, 479).   While no specific words are required to invoke the privilege against self-incrimination, the request to "cut off questioning" must be unambiguous.   *Davis*, 512 U.S. at 459.

The Michigan Court of Appeals denied relief on this claim, explaining:

> Defendant also argues that Sergeant Diaz neglected to heed a request that he halt the second interview.   Defendant suggests that his desire to stop the interview is reflected by his answer, "Yeah," in response to Sergeant Diaz's statement, "[I]f you want me to stop, we'll stop. I'm done." Defendant's "[y]eah" response again seems to represent his affirmative acknowledgment of the content of Diaz's immediately preceding statement, especially when considered together with the short, prior context of their conversation that defendant provides in his brief.   Two of defendant's four quoted responses to Diaz consist of the one word reply, "Yeah," and a third response elaborated slightly, "Yes, you know." Furthermore, Diaz clearly and thoroughly went on to discuss defendant's constitutional rights with him before eliciting his statement, and defendant continued speaking with Diaz, without any subsequent elaboration concerning his purported desire to stop the interview.   We discern no error, plain or otherwise, relating to defendant's claim that Diaz ignored his request to halt the interview.

*Bailey*, 2011 WL 5374959, at *5.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.   Petitioner's use of the word "yeah" in response to Sergeant Diaz's statement was not an unambiguous request to end the interrogation. Rather, it could reasonably be understood as petitioner acknowledging his right to stop the questioning if he wanted to do so.   Petitioner did not make any comment which clearly, or even reasonably, indicated that he wanted to stop answering questions; there was no unambiguous request to end the second interview with Diaz.   Petitioner fails to establish a violation of his Fifth Amendment rights or his *Miranda* rights.   Habeas relief is not warranted on this claim regarding petitioner's request to terminate his second interview.

### 3. Voluntariness of the Confession

Lastly, petitioner asserts that his confession was involuntary. The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988).

In determining whether a confession is voluntary, the ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Factors to consider include (1) police coercion (a "crucial element"), (2) the length of the interrogation, (3) the location of the interrogation, (4) the continuity of the interrogation, (5) the suspect's maturity, (6) the suspect's education, (7) the suspect's physical and mental condition, and (8) whether the suspect was advised of his or her *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). All of the factors should be closely scrutinized, *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961), but without coercive police activity, a confession should not be deemed involuntary. *See Connelly*, 479 U.S. at 167 (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause"). To constitute coercion, the police conduct must overbear the suspect's will to resist. *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976)). An

involuntary confession may result from psychological, as well as physical, coercion or pressure by the police. *Arizona v. Fulminante*, 499 U.S. 279, 285-89 (1991). A petitioner has the burden of proving that a statement was involuntary. *Boles v. Foltz*, 816 F.2d 1132, 1136 (6th Cir. 1987).

The Michigan Court of Appeals considered the totality of the circumstances surrounding petitioner's interrogation and concluded that petitioner's confession was voluntary and properly admitted at trial. The court explained in relevant part:

> Defendant insinuates that his statements to Agent Gunnarson and Sergeant Diaz qualified as involuntary because he felt severe emotional strain when he submitted to the interviews. Gunnarson recounted that defendant had started crying during the first interview, and Officer Jimenez similarly described that defendant had cried and seemed despondent on returning to his jail cell. About 30 minutes later, Jimenez went to defendant's cell to check on him, and defendant apprised Jimenez, "I'm ready to talk now." When an emergency demanded Jimenez's attention, he left defendant with Diaz, who recalled that at the time of his first contact with defendant in a hallway of the police homicide division, defendant "was clearly . . . upset." Ten or 15 minutes later, however, when defendant seemed calmer, Diaz escorted him to an interview room. Diaz denied that defendant had ever mentioned any complaints whatsoever during the second interview. At the suppression hearing, defendant testified that he felt fine during the interview by Gunnarson, except for some concern for the victim. In short, nothing in the record substantiates defendant's suggestion that any emotional issue impacted the voluntariness of his statements.[3]
>
> > FN3 Additionally, nothing in the record gives rise to a suggestion that defendant lacked sleep at the time of his interviews.
>
> Defendant further avers that Agent Gunnarson and Sergeant Diaz "represented . . . that making a statement would benefit him." "[A] confession will be considered the product of a promise of leniency if the defendant is likely to have reasonably understood the statements as a promise of leniency and if the defendant relied upon the promise in making his confession." *People v. Butler*, 193 Mich App 63, 69; 483 NW2d 430 (1992). Defendant does not identify with any greater specificity what benefit he thought participating in his interviews might

bring him. Given the absence of any detail of record concerning a "benefit" potentially flowing to defendant if he made a statement, we conclude that defendant cannot "reasonably [have] understood the [police] statements as a promise of leniency." *Butler*, 193 Mich App at 69.

Defendant additionally characterizes as undermining the voluntary nature of his participation in the second interview Sergeant Diaz's urging that he "give the [victim's] family closure." Police influence that induces a defendant to offer a statement may take the form of mental coercion, as well as physical. *People v. Manning*, 243 Mich App 615, 625; 624 NW2d 746 (2000). Our review of defendant's preliminary conversation with Diaz reveals that Diaz only once broached the topic of closure when he remarked, "If you don't want to talk, no pressure, no nothing[;] I want to give this family closure." After the initial mention of closure, defendant repeated three times that he "want[ed] to give the family closure." It does not appear that Diaz psychologically coerced defendant's statement through Diaz's lone record mention of closure for the victim's family.

Defendant also asserts that threats to his mother and sister motivated his statements to Sergeant Diaz. Defendant's argument about threats presumably stems from the following testimony he presented at the suppression hearing:

> Well, [Diaz] was telling me that I ought to give the family closure and he said . . . "I've been out to . . . your mother's house," and I said yes. And he said he knew she lived alone. I said yes. He said, "Your sister, she goes to work early in the morning." I said yes. . . . He said, "You don't want that kind of thing to happen to your mother that happened to Ms. Paramore." I said no. He said, well, just tell the truth. . . .

Diaz's references to defendant's mother, sister, and the victim were apparently intended to try to make defendant identify with the victim. We do not detect any hint of a threat reasonably arising from Diaz's comments.

Defendant lastly submits that an extended, several-day delay between the time of his arrest and his arraignment also "contributed to the involuntariness of [his] statements," another argument he did not raise in the trial court. The police arrested defendant in the late afternoon of June 14, 2009, defendant's first interview with Agent Gunnarson occurred on the evening of June 15, 2009, and defendant's second interview with Sergeant Diaz took place in the early morning hours of June 16, 2009.

The trial court's register of actions reveals that a warrant issued on June 17, 2009, and that defendant was arraigned on June 18, 2009. Although a delay exceeding 48 hours between a defendant's arrest and arraignment qualifies as presumptively unreasonable, this period of delay does not automatically mandate that a court suppress statements obtained during the detention period. *Manning*, 243 Mich App at 642–643. This Court in *Manning* explained:

> When a confession was obtained during an unreasonable delay before arraignment, in Michigan the *Cipriano* factors still must be applied. The unreasonable delay is but one factor in that analysis. The longer the delay, the greater the probability that the confession will be held involuntary. At some point, a delay will become so long that it alone is enough to make a confession involuntary.
>
> In engaging in the balancing process that *Cipriano* outlines, a trial court is free to give greater or lesser weight to any of the *Cipriano* factors, including delay in arraignment. A trial court cannot, however, give preemptive weight to that one factor. . . . [*Id*. at 643.]

The Court in *Manning* held that, taking into account the other voluntariness factors, a delay of "at least eighty-one hours after [the defendant's] arrest without a warrant" did not standing alone justify the exclusion of the defendant's custodial statement. *Id*. at 644–645.

Taking into account the totality of the voluntariness considerations identified in Michigan case law, the record in this case establishes that defendant voluntarily offered his statements. At the time of defendant's interviews, he was 51 years of age. Defendant acknowledged that he had multiple prior arrests by and interviews with law enforcement, and that he had understood the prior recitations of his constitutional rights. Regarding defendant's education and intelligence level, the extent of defendant's schooling appears unclear, although he could read and write and had enough intelligence to operate a cement contracting business. Defendant underwent two interviews within approximately 1–1/2 days of his arrest, but he initiated the second interview after at least a half-hour rest or break period between the discussions. The first interview lasted three hours. The record does not specify precisely when the second interview, which began after 2:00 a.m. on June 16, 2009, ended, however no indication exists that the second interview qualified as unduly long. Agent Gunnarson and Sergeant Diaz both testified that defendant seemed to comprehend their identifications of his constitutional rights in this case.

Nothing in the record indicates that defendant "was injured, intoxicated or drugged, or in ill health when he gave the statement [s]," that he needed "food, sleep, or medical attention," or that the police physically abused him or threatened him with abuse. *Cipriano*, 431 Mich. at 334.

In conclusion, under the totality of the circumstances, the prosecution proved by a preponderance of the evidence that defendant voluntarily waived his *Miranda* rights and offered his incriminating statements to the officers. *Daoud*, 462 Mich. at 633–634. Consequently, the trial court did not err in denying defendant's motion to suppress.

*Bailey*, 2011 WL 5374959, at *6-8 (alterations in original).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, there is no evidence of improper or overbearing coercion by the police. Petitioner asserts that he was coerced by Gunnerson's and Diaz's comments that "making a statement would benefit him." A promise of leniency may render a confession coerced, depending on the totality of the circumstances. *United States v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011); *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003) (deducing the rule that "promises of leniency may be coercive if they are broken or illusory"); *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992) ("[A] promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary."). Vague comments about the benefits of cooperation or a promise to recommend leniency, however, are generally not seen as coercive. *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005); *United States v. Cruse*, 59 F. App'x 72, 78 (6th Cir. 2003). The Michigan Court of Appeals reasonably concluded that the police comments at issue here were not coercive. They are not inherently coercive and it is reasonable to conclude that they did not overcome petitioner's will given his age, familiarity with the criminal justice system, and the other circumstances surrounding his confession.

Petitioner also asserts that he was coerced by Diaz's remarks about closure for the victim's family and his statement that petitioner would not want the same thing to happen to his mother and sister. Such references to the victim's family and petitioner's family are not objectively coercive. An interrogator's appeal to a suspect's emotions generally does not constitute police coercion. *McCall*, 863 F.2d at 460 (concluding that "mere emotionalism and confusion" did not by itself constitute police coercion); *Hopkins v. Cockrell*, 325 F.3d 579 (5th Cir. 2004) (same). This is so even when the emotional appeal concerns the defendant's family. *United States v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002) (finding defendant's statement voluntary despite alleged threat of legal action against his girlfriend and daughter because they "were not of such gravity that an ordinary person, much less someone of [defendant's] age and experience, would have lost the will to resist"); *United States v. Brave Heart*, 397 F.3d 1037, 1041 (8th Cir. 2005) (determining that defendant's confession was voluntary although the investigator told defendant that he understood defendant's "stress and pressure" and it was unfair that defendant's one-year-old son would bear responsibility for the death of defendant's infant nephew). Diaz's comments can reasonably be construed as attempts to solicit sympathy for the victim's family and they were not so coercive as to overcome petitioner's will to resist.

Moreover, the other circumstances of the interview indicate that petitioner's confession was voluntary. The first part of the interrogation lasted only three hours and the second was apparently not of significant length (although no exact time frame is noted in the record). There was also about a thirty-minute break between the two sessions. While the interrogation occurred at the jail after petitioner had been held for a day and a half, there is no indication that the conditions at the jail were unusually difficult. Nor is there any indication

that the police delayed questioning for any improper purpose.   Rather, the delay may have been due to the fact that petitioner smelled of alcohol at the time of his arrest and the police wanted to ensure his sobriety before questioning him.   Petitioner was fifty-one years old, could read and write, operated his own cement work business, and was familiar with the police and the criminal justice system due to prior arrests.   Although petitioner was upset and crying at one point during the process, the record does not indicate that he was so distraught that he was unable to voluntarily consent to the interrogation or that his will was overborne.   The fact that he was emotional is insufficient, on its own, to require a finding that his confession was involuntary.   *Connelly*, 479 U.S. at 164; *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989); *Conklin v. Warren*, No. 2:12-CV-10385, 2014 WL 584901, at *22-23 (E.D. Mich. Feb. 14, 2014) (denying habeas relief on a similar claim).   Further, petitioner does not claim that his physical or mental condition was impaired or that he was deprived of food, water, or other necessities.   Petitioner was also advised of his constitutional rights on multiple occasions and agreed to take a polygraph and to speak with the police.   A review of the totality of the circumstances surrounding petitioner's confession supports the state court's determination that petitioner's confession was knowing and voluntary.   Habeas relief is not warranted on this claim.

**V. Conclusion**

The state courts' rejection of petitioner's claims did not result in decisions that were contrary to, or involved an unreasonable application of, Supreme Court precedent and were not based on an unreasonable determination of the facts.   Nor were the decisions of the state courts so lacking in justification that there was an error beyond any possibility for

fairminded disagreement.   Accordingly,

IT IS ORDERED that petitioner's application for a writ of habeas corpus is denied.

IT IS FURTHER ORDERED that a certificate of appealability is denied because petitioner has not made "a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).

IT IS FURTHER ORDERED that petitioner may not proceed on appeal in forma pauperis because an appeal could not be taken in good faith.

Dated: September 27, 2018          s/Bernard A. Friedman
Detroit, Michigan                          BERNARD A. FRIEDMAN
                                                   SENIOR UNITED STATES DISTRICT JUDGE

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on September 27, 2018.

                                                   s/Johnetta M. Curry-Williams
                                                   Case Manager